# EXHIBIT A

Case 1:24-cv-03782-NGG-MMH   Document 1-1   Filed 05/14/24   Page 2 of 70 PageID #: 9

INDEX #_____ DATE FILED_____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
HARRY W. LIPMAN,

                                  Plaintiff,

      - against -

EXACTECH, INC.: EXACTECH U.S., INC.; TPG INC.;
OSTEON HOLDINGS, INC.; OSTEON MERGER SUB,
INC.; OSTEON INTERMEDIATE HOLDINGS II, INC.,

                                  Defendants.
------------------------------------------------------------------------X

Plaintiff designates
NEW YORK COUNTY
as the place of trial

**S U M M O N S**

Basis of Venue:
Location of Occurrence

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:      New York, New York
            April 15, 2024

_____
THE LAW OFFICES OF JEFFREY B. MELCER, PLLC
Attorneys for Plaintiff
65 Broadway, Suite 1101
New York, New York 10006
(212) 980-8470
By: Jeffrey B. Melcer, Esq.

Case 1:24-cv-03782-NGG-MMH   Document 1-1   Filed 05/14/24   Page 3 of 70 PageID #: 10

TO:    EXACTECH, INC.;
2320 NW 66th Court, Gainesville, Florida 32653
1201 Hays St., Tallahassee, FL 32301

EXACTECH U.S., INC.;
2320 NW 66th Court, Gainesville, Florida 32653
1201 Hays St., Tallahassee, FL 32301

TPG, INC.;
301 Commerce Street, Suite 3300, Fort Worth, TX 76102

OSTEON HOLDINGS, INC.
The Corporation Trust Company (Registered Agent)
1209 N. Orange, Wilmington, DE 19801
301 Commerce Street, Suite 3300, Fort Worth, TX 76102

OSTEON MERGER SUB, INC.
Corporate Creations Network, Inc. (Registered Agent)
11380 Prosperity Farms Road 221E Palm Beach Gardens, FL 33410
301 Commerce Street, Suite 3300, Fort Worth, TX 76102

OSTEON INTERMEDIATE HOLDINGS II, INC.
2320 NW 66th Court, Gainesville, FL 32653

Case 1:24-cv-03782-NGG-MMH   Document 1-1   Filed 05/14/24   Page 4 of 70 PageID #: 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------------X
HARRY W. LIPMAN,

         Plaintiff,

  - against -

EXACTECH, INC.; EXACTECH U.S., INC.; TPG INC.;
OSTEON HOLDINGS, INC.; OSTEON MERGER SUB,
INC.; OSTEON INTERMEDIATE HOLDINGS II, INC.,

         Defendants.

--------------------------------------------------------------------------X

Index No.


**VERIFIED COMPLAINT**

   Plaintiff HARRY W. LIPMAN, by his attorneys THE LAW OFFICES OF JEFFREY B. MELCER, PLLC, complaining of defendants EXACTECH, INC. (hereinafter "EXACTECH"); EXACTECH U.S., INC. (hereinafter "EXACTECH U.S."); TPG INC.; OSTEON HOLDINGS, INC. (hereinafter "OSTEON"); OSTEON MERGER SUB, INC. (hereinafter "MERGER"); OSTEON INTERMEDIATE HOLDINGS II, INC. (hereinafter "HOLDINGS") (also, all collectively known as "Defendants") , herein, all upon information and belief, respectfully alleges as follows:

NATURE OF THE ACTION

   1.  This is an action for damages relating to Defendants' developing, designing, testing, assembling, manufacturing, packaging, monitoring, labeling, preparing, distributing, marketing, supplying, storing, and/or selling of the Exactech Optetrak LPI - ARC system which included the Optetrak Logic Trapezoidal Tibial Base (hereinafter "The Devices"). The Devices as referred to in this Complaint includes the aforementioned Optetrak Logic Trapezoidal Tibial Base but may include all of the Defendant EXACTECH made devices implanted into plaintiff's knee including but not limited to the Exactech - Optetrak Logic Femoral Component (Size 4, Left, Posterior Stabilized, Lot#: 406679924102010010240); Exactech - Optetrak Logic Trapezoidal Tibial Base (Size 4F/4T, Cemented, Lot#: 439073324102012414040); Exactech - Optetrak Logic (Size 4, 11mm, PS,

Constrained, Lot#: 123) and Exactech - Three-Peg Cemented Patella (32mm, Lot#: 43697112412000232).

2.     Thousands of patients, like Plaintiff HARRY W. LIPMAN, have been, and/or will be, required to undergo extensive revision surgery to remove and replace defective Devices due to a recent recall of these Devices which first revealed to patients and surgeons that the polyethylene components within the prosthesis prematurely degrades over time causing an inflammatory response resulting in bone necrosis (death) also known as osteolysis.

3.     A recall notice issued by defendant EXACTECH and or defendant EXACTECH U.S. on April 7, 2022, admits that a recall of the Devices was made necessary and that problems arose from Defendants failure to properly package the polyethylene insert component of the Devices.

4.     As a result of Defendants' failure to properly package the Devices prior to distribution, the polyethylene liner prematurely degraded and Plaintiff required a total knee replacement revision surgery and an arthroscopic follow up surgery due to severe pain, swelling, and instability in the left knee and leg. These injuries were caused by early and preventable wear of the polyethylene insert and resulting component loosening and/or other failures causing serious complications including tissue damage, osteolysis, permanent bone loss and other injuries.

5.     Recipients of the Devices, like Plaintiff, have been required to undergo revision surgeries well before the estimated life expectancy of a knee implant and at a much higher rate than should reasonably be expected for devices of this kind and have suffered pain and disability leading up to and after the revision surgery.

6.     Despite knowledge that the Devices and or it's design and or packaging  was defective and resulted in premature failures and accompanying complications, Defendants only first issued a nationwide recall on February 7, 2022, advising the public that "most of our inserts since

2004 were packaged in out of specification . . . vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance."

7. As a direct and proximate result of the defective nature of Defendants' Devices surgically implanted in Plaintiff, which necessitated premature removal, Plaintiff suffered and will continue to suffer serious personal injuries, including pain, impaired mobility, rehabilitation, medical care, loss of enjoyment of life, and other medical and non-medical sequellae.

8. Plaintiff brings this action for personal injuries suffered as a proximate result of failure of the Devices. Plaintiffs accordingly seek compensatory and punitive damages, and all other available remedies provided to Plaintiff under the law due to the Defendants' negligent, reckless, and wrongful conduct.

## JURISDICTION & VENUE

9. This Court has jurisdiction over this action pursuant to CPLR §301 because Defendants conduct business in the State and County of New York. Alternatively, this Court has jurisdiction pursuant to CPLR §302 because the tortious acts alleged herein took place in the State of New York within New York County.

10. Venue is proper in this Court under CPLR §503 (a) in that a substantial part of the events and omissions giving rise to this claim occurred at the Hospital for Special Surgery ("HSS") located at 535 East 70th Street, New York, New York 10021 within New York County.

## THE PARTIES

11. Plaintiff HARRY W. LIPMAN is a resident of Kings County, City and State of New York.

Case 1:24-cv-03782-NGG-MMH   Document 1-1   Filed 05/14/24   Page 7 of 70 PageID #: 14

12. Defendant EXACTECH is a foreign business corporation, being based in Florida with its principal place of business located at 2320 NW 66th Court, Gainesville, Florida 32653 but doing business in New York County amongst other places throughout the United States.

13. Defendant EXACTECH develops, manufactures, packages, stores, distributes, markets, and sells orthopedic implant devices, including the Exactech Optetrak LPI - ARC system which included the Devices in question in this suit and related surgical instrumentation throughout the United States, including in and throughout the State of New York.

14. Defendant EXACTECH manufactured the Devices implanted in Plaintiff HARRY W. LIPMAN.

15. At all times relevant to this action, Defendant EXACTECH tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices in interstate commerce and throughout the State of New York and generated substantial revenue as a result.

16. Defendant EXACTECH U.S, a wholly owned subsidiary of Defendant EXACTECH, is a domestic Florida corporation with its principal place of business located at 2320 NW 66th Court, Gainesville, Florida 32653.

17. According to public filings, Defendant EXACTECH U.S., conducts Defendants' sales and distribution activities in the United States.

18. EXACTECH U.S is engaged in the business of designing, developing, testing, assembling, selecting, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing Defendants' products, including the Exactech Optetrak LPI - ARC system which included the Devices in question in this suit and related surgical instrumentation throughout the United States, and placed the Devices into the stream of commerce

throughout the United States and the State of New York.

19.     Upon information and belief, the Devices manufactured by Defendant EXACTECH were distributed by Defendant EXACTECH U.S throughout the United States, including to the Hospital for Special Surgery (HSS) in New York, New York, where Plaintiff received his implants.

20.     At all times relevant to this action, Defendant EXACTECH U.S. tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, stored, promoted, advertised, marketed, distributed, and/or sold the Devices in interstate commerce and throughout the State of New York and generated substantial revenue as a result.

21.     Defendant TPG, Inc. is a Delaware corporation that has its principal place of business at 301 Commerce Street, Suite 3300, Fort Worth, TX 76102. and is domiciled in Delaware and Texas.

22.     TPG, Inc. was formerly known as both TPG Capital, LP and TPG Partners, LLC (hereinafter collectively referred to as "TPG").

23.     Upon information and belief, TPG Capital, LP converted to TPG, Inc. in or around December 2021.

24.     TPG Partners, LLC converted to TPG, Inc. in or around December 2021.

25.     TPG, Inc. is a publicly traded company on the NASDAQ Stock Exchange with a business model based on privatizing companies.

26.     TPG, Inc. is an alternative asset manager that works with companies in many sectors, including the medical device sector.

27.     The healthcare sector is one of TPG, Inc.'s most active sectors.

28.     As set forth in further detail below, in February 2018, TPG, Inc.'s predecessor entity - TPG Capital, LP - paid over $737 million to merge with Defendant EXACTECH ("2018 Merger").

29.     TPG, Inc. is not a passive investor. It touts its ability to "create products and services [that have] delivered breakthrough innovation" in the healthcare industry, as well as its "unique approach" to "building great companies."

30.     Defendant OSTEON is a Delaware corporation that has its principal place of business in Delaware and is an indirect wholly owned subsidiary or indirect beneficially owned affiliate of TPG, Inc.

31.     Defendant OSTEON is a citizen of Delaware and was formerly known as Osteon Holdings, LP.

32.     Defendant OSTEON converted to Osteon Holdings, Inc. in or around February 2018.

33.     Defendant MERGER is a Texas corporation that has its principal place of business in Florida and is a wholly owned subsidiary of Defendant OSTEON.

34.     Defendant MERGER is domiciled in Florida and Texas.

35.     Defendant HOLDINGS, is a Delaware corporation that has its principal place of business in Delaware and has been identified in public court filings as the Parent corporation of Defendant EXACTECH. Defendant HOLDINGS is domiciled in Delaware.

36.     At all relevant times, Defendant HOLDINGS (formerly known as Osteon Holdings, LP), Defendant MERGER, and Defendant HOLDINGS (hereinafter collectively known as "OSTEON") have been controlled by TPG, Inc. or its predecessor entities.

37.     Defendants TPG, Inc., OSTEON, MERGER, and HOLDINGS are hereinafter collectively referred to as the "TPG Defendants."

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 10 of 70 PageID #: 17

38. The TPG Defendants, through and in concert with related entities TPG Partners VII, LP, TPG Genpar VII, LP, TPG Genpar VII Advisors, LLC (collectively TPG Fund Entities), exercised control over the merger with Defendant EXACTECH and subsequent operations of Defendant EXACTECH for their direct benefit and they used Defendant EXACTECH to engage in improper conduct as outlined herein and caused harm to Plaintiff through such improper conduct.

39. The TPG Defendants used Defendant EXACTECH as an agent, alter ego, and mere instrumentality such that the TPG Defendants maintained control over Defendant EXACTECH. Moreover, Defendant EXACTECH and the TPG Defendants should be held jointly and severally liable.

FACTUAL BACKGROUND

40. Upon information and belief, the first Optetrak total knee system was available for implantation in 1994, building upon technology licensed from the Hospital of Special Surgery in New York.

41. At all times material hereto, Defendants designed, developed, tested, assembled, selected, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted, and/or sold the Optetrak and Trulaint Total Knee Systems to hospitals in many states, including to the Hospital for Special Surgery in New York, New York.

42. Between 1994 and 2015, Defendants obtained 510(k) clearance from the Food and Drug Administration ("FDA") for various Optetrak total knee system devices and components, including the OPTETRAK LOGIC® knee system and Optetrak Logic PSC Tibial Insert.

43. The Optetrak Total Knee System is classified as a knee joint patello-femoro-tibial polymer/metal/polymer semi-constrained cemented prosthesis. It features a mix of polyethylene and metal-based components.

Case 1:24-cv-03782-NGG-MMH     Document 1-1     Filed 05/14/24     Page 11 of 70 PageID #: 18

44. According to Defendants, the Optetrak Device introduced "novel implants and instruments to make the total knee procedure easier, faster, and more consistent, improving patient satisfaction for a more diverse population requiring total knee replacements.

45. 510(k) clearance is distinct from the FDA's pre-market approval ("PMA") process in that clearance does not require clinical confirmation of safety and effectiveness and as such the manufacturer retains all liability for the assertions of safety and effectiveness.

46. 510(k) clearance only requires the manufacturer to notify the FDA under Section 510(k) of the Medical Device Amendments of 1976 to the Food Device Cosmetic Act (MDA) of its intent to market a device at least ninety days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then "clear" the new device for sale in the United States.

47. All the component parts comprising Plaintiff's Devices were cleared for marketing by the FDA pursuant to 510(k) process or were marketed without receiving either 510(k) clearance or PMA approval by the FDA.

48. The Devices are comprised of the following parts: a patellar cap, femoral cap, tibial insert and tibial tray.

49. The patellar cap and tibial insert are made of polyethylene.

50. Defendants touted the Optetrak Devices as being first-in-class in their product brochures.

51. In their marketing materials, the Defendants promised that the Devices had excellent long-term clinical outcomes and that "surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system."

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 12 of 70 PageID #: 19

52.    Defendants promoted their Optetrak Devices as a system with nearly three decades of clinical success and proven outcomes for patients around the world because of an improved articular design resulting in low polyethylene stresses.

53.    However, Optetrak Devices have performed poorly when compared to their competitors. For example, the Australian Orthopaedic Association, a preeminent, internationally recognized orthopedic implant registry, has identified the Optetrak as an implant with a higher-than-expected rate of revision.

54.    According to the 2020 Australian National Joint Replacement Registry, the rate of revision for a total knee replacement utilizing an Optetrak tibial component with a Optetrak-CR femoral component was 8.5% at ten years and 10.2% at ten years when implanted with a OptetrakPS femoral component, which far exceeds international guidelines for accepted revision rates.

55.    Per the recommendations established by the International Benchmarking Working Group and applied by the Australian Orthopaedic Association, the Optetrak Devices do not qualify for a "superiority benchmark" or even a "non-inferiority benchmark."

56.    At all times relevant, Defendants have been aware of a high rate of early failures associated with the Optetrak Devices.

57.    Upon information and belief, by 2012, Defendants had further clinical evidence that Optetrak Devices were failing at a rate higher than promoted. Reports in the Manufacturer and User Facility Device Experience (MAUDE) indicate instances of revision due to "loose tibial component," "aseptic loosening," "pain and visible loosening," "polyethylene deformation," "polyethylene worn," and "pain, limited mobility, knee swelling and sensitivity" due to "loose" joint.

Case 1:24-cv-03782-NGG-MMH   Document 1-1   Filed 05/14/24   Page 13 of 70 PageID #: 20

58.     Upon information and belief, in 2013, complaints continued to be reported. Some examples include revision for "tibial loosening" just two years postoperatively, "revision due to tibial loosening," "during revision, the tibial component was found to be loose and easily removed," "revision of knee component due to loosening," and "revision due to pain and loosening."

59.     Upon information and belief, the complaints of early onset failures continued in 2014. Some examples include "revision due to tibial loosening," "tibial loosening," "revision of optetrak knee components due to tibial loosening," "revision due to pain and loosening," "revision of optetrak knee components due to aseptic loosening," several reports described as "revision of knee components due to tibial loosening," and "revision of optetrak knee components reportedly due [to] aseptic loosening."

60.     The general practice in orthopedic implant surgeries generally, and with Defendant EXACTECH implants specifically, is for the sale representative of the manufacturer, in this case Defendant EXACTECH's authorized representative and agent, hereinafter "the sales rep," to be present at the time of surgery to provide implant components to the surgeon, relieving the hospital of the responsibility for having on stock all potential sizes and components that may be needed in surgeries. This practice includes the original implant surgery and any revision surgery.

61.     The sales reps of Defendant EXACTECH observed many instances of premature failures of the Devices with plain evidence upon revision of polyethylene debris that needed to get removed, a/k/a "debrided," visible bone loss or osteolysis and plainly loose components that were easy to remove due to lack of fixation. Often these sales reps would take the component from the surgeon to return to the company for inspection and analysis.

62.     The sales reps of Defendant EXACTECH were under a duty to report these findings to the engineering and medical departments of Defendant EXACTECH who were under a duty to then do an investigation, analyze the removed component when available, also known as "retrieval analysis," and honestly and thoroughly report such findings to the FDA and the surgeons.

63.     Despite Defendants' knowledge of early onset failures of the Optetrak Devices, Defendants continued to manufacture, promote, and distribute the Devices without alerting surgeons, patients, or the FDA of the potential increased risks of early onset failures of the Optetrak Devices.

64.     Defendants never changed the labeling, marketing materials, or product inserts to adequately and accurately warn patients or physicians of the associated increased risks of early failure due to loosening and/or polyethylene wear.

65.     Furthermore, despite evidence indicating the Optetrak Devices performed poorly, sales representatives observing an alarming trend of revisions due to wear and loosening, and international data identifying the Optetrak as an implant with a higher-than-expected rate of revision, instead of making design changes, Defendants chose to expand its product line again utilizing the 510(k) process in 2017 to begin selling its newer Truliant design which "maintained many of the proven design features of the Optetrak and Optetrak Logic Knee Systems to help minimize contact stresses at the articular surfaces between the femoral and tibial components, thus lowering the potential for surface damage and wear." See https://www.exac.com/wp-content/uploads/2019/05/12-0000131_Rev A_Truliant_Design_Rationale_Web.pdf.

66.     In fact, while knowing the Optetrak Devices failed to meet the "superiority" or even a "non-inferiority" benchmarks as set forth by the International Benchmarking Working Group and Australian Orthopaedic Association, Defendants went on to represent the Truliant as continuing "to use the gold standard on the market as its predecessors have for many years…" Id.

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 15 of 70 PageID #: 22

67.     In said publication, Defendants further noted Truliant's "polyethylene tibial inserts are molded individually…resulting in the component being more resistant to oxidation and therefore wear." Id.

68.     Defendants made such representations despite admitting "there is little to no clinical history on these…" but represented the Truliant Devices was safe and effective because it derived from "an evolution of the Optetrak lineage which has demonstrated excellent long-term outcomes" without acknowledging known evidence of unreasonably high failure rates. Id.

69.     Not until August 30, 2021 did the Defendants take some action and issue a partial recall of all Optetrak All-polyethylene tibial components, including the OPTETRAK All - polyethylene CC Tibial Components; OPTETRAK All-polyethylene CR Tibial Components; OPTETRAK All-polyethylene CR Tibial Sloped Components; OPTERAK All-polyethylene PS Tibial Components; OPTETRAK HI-FLEX PS Polyethylene Tibial Components; OPTETRAK Logic All-polyethylene CR Tibial Components; OPTETRAK Logic All-polyethylene CRC Tibial Components; OPTETRAK Logic All-polyethylene PSC Tibial Components; OPTETRAK Logic Modular PS Tibial Components; OPTETRAK Logic RBK PS Tibial Components; TRULIANT CR Tibial Inserts; TRULIANT CRC Tibial Inserts; TRULIANT PS Tibial Inserts; and TRULIANT PSC Tibial Inserts.

70.     In issuing the August 2021 partial recall, Defendants stated that inserts were packaged in vacuum bags that lacked an additional oxygen barrier layer. See Class 2 Devices Recall O P T E T R A K C o m p r e h e n s i v e K n e e S y s t e m , F D A ( O c t . 4 , 2 0 2 1 ) , https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRes/res.cfm?ID=189266 (last visited Jan. 21, 2023).

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 16 of 70 PageID #: 23

71.     According to the FDA website, "Exactech began notification to distributors and sales representatives on about 08/30/2021 via letter titled "URGENT MEDICAL DEVICE RECALL." Actions being taken by Defendant EXACTECH included removing all Knee and Ankle UHMWPE products labeled with an 8-year shelf life and not packaged in EVOH/Nylon bags. This will be performed in a phased approach over the next 12 months. Phase 1 includes immediately return all knee and ankle UHMWPE devices labeled with an 8-year shelf life that will be 5 years old or older by 08/31/2022 not packaged in EVOH/Nylon bags. Phase 2 includes, between 05/31/2022 to 08/31/2022, returning all remaining knee and ankle UHMWPE devices labeled with an 8-year shelf life not packaged in EVOH/Nylon bags." Id.

72.     Despite initial communications with distributors and sales representatives, Defendants did not issue any communications to surgeons who had implanted Devices with a recalled polyethylene component or to patients who had received an Devices with a recalled polyethylene component until months later in February 2022.

73.     On February 7, 2022, Defendants issued an "Urgent Medical Device Correction" in which it informed health care professionals that: After extensive testing, we have confirmed that most of our inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "nonconforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance. The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or

FILED: NEW YORK COUNTY CLERK 04/15/2024 02:57 PM
INDEX NO. 153451/2024
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 04/15/2024

Case 1:24-cv-03782-NGG-MMH   Document 1-1   Filed 05/14/24   Page 17 of 70 PageID
#: 24

component fatigue cracking/fracture, all leading to corrective revision surgery. See Letter from Darin Johnson, President & CEO, Defendant EXACTECH and Sharat Kusuma, Senior Vice President & Chief Medical Officer, Defendant EXACTECH, to Exactech Surgeons, Urgent Medical Device Correction (Feb. 7, 2022) [hereinafter Defendant EXACTECH Recall Letter].

74. The "Urgent Medical Device Correction" went on to further state that Defendants were expanding the recall to include all knee arthroplasty polyethylene inserts packed in non conforming bags regardless of label or shelf life. The components subject to the recall now included: OPTETRAK®: All-polyethylene CR Tibial Components, All-polyethylene PS Tibial Components, CR Tibial Inserts, CR Slope Tibial Inserts, PS Tibial Inserts, HI-FLEX® PS Tibial Inserts; OPTETRACK Logic®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts, CC Tibial Inserts; and TRULIANT®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts. Id.

75. It is estimated that a total of 147,732 inserts implanted in the United States since 2004 were produced with non-conforming packaging. Id.

76. Defendants further acknowledged the original Optetrak knee system has shown statistically significant higher overall revision rates compared to other total knee arthroplasties in the Australian, United Kingdom, and New Zealand joint registries. Id.

77. Specifically, reasons for revision associated with polyethylene wear, including loosening, lysis, and pain, were increased three- to seven-fold with the Optetrak total knee replacement combination of the Optetrak-PS/Optetrak, according to the 2021 Australian National Joint Replacement Registry with revision diagnoses related to accelerated polyethylene wear possibly related to the non-conforming packaging. Id.

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 18 of 70 PageID #: 25

78.     Implanting surgeons were advised in the February 2022 notice to contact patients previously implanted with recalled components and to schedule an evaluation if the patient is experiencing any new or worsening knee swelling, pain while walking, inability to bear weight, grinding or other noise, instability, or any new symptoms of clicking in the knee. Id.

79.     Furthermore, Defendants advised surgeons that revision surgery should be considered for patients who exhibit premature polyethylene wear. Id.

80.     Based on Defendants' own representations, since 2004, Defendants manufactured, promoted, and distributed the Devices without ensuring the polyethylene components were properly packaged to prevent or minimize oxidation. At no point until August 2021 did Defendants first modify the packaging in an effort to address this defect.

81.     In approximately 2017–2018, Defendant EXACTECH was in the process of being acquired by the Private Equity Group TPG Capital, which in February 2018 successfully completed a merger agreement. As a result, TPG acquired all of the issued and outstanding common stock of Defendant EXACTECH. In connection with the transaction, Defendant EXACTECH's founders, CEO, and certain other management shareholders exchanged a portion of their shares in the transaction, for new equity securities in the post-closing ownership of the Company. See Exactech Announces Completion of Merger with TPG Capital, EXACTECH (Feb. 14, 2018), https://www.exac.com/exactechannounces-completion-of-merger-with-tpg-capital (last visited Jan. 21, 2023).

82.     Disclosure of knowledge of the improper packaging and excessive premature failure rates could have harmed this transaction.

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 19 of 70 PageID #: 26

83.     Defendant EXACTECH sold and distributed these defective Devices without adhering to the established industry standards for: the processing of UHMWPE, thermal treatment of irradiated UHMWPE, packaging of irradiated UHMWPE, and proper testing of the Devices for oxidation, accelerated wear, degradation, pitting, and delamination.

84.     Additionally, Defendant EXACTECH failed to properly design, manufacture, test, surveil clinical history and report to regulatory authorities and clinicians failures of its defective femoral components of its Optetrak and Truliant knee systems. See E.B. GAUSDEN, ET. AL., Mid-term Survivorship of Primary Total Knee Arthroplasty with a Specific Implant, BONE JOINT J., 105-B(3): 277-283, Mar. 2023. Femoral components that improperly loosen and do not adhere create micromotion and increase risk of higher volumetric polyethylene wear.

85.     In a March 2023 article in THE BONE & JOINT JOURNAL, a report of a study conducted at the Hospital for Special Surgery provided that surgeons at that facility saw "an increase in revision of Optetrak TKAs for aseptic loosening, early and severe polyethylene wear, osteolysis, as well as component loosening related to cement debonding." Id.

86.     Because of Defendant EXACTECH's tortious acts and omission, including but not limited to its negligence in design and manufacture, including packaging, of its Devices, patients implanted with the Exactech Knee Devices have had to undergo (or likely will have to undergo) significant revision surgeries to remove and replace the defective devices.

87.     At all times relevant to this action, Defendants were aware of the Devices' propensity to undergo substantial early polyethylene wear consisting of the degradation and breakdown of the plastic chemicals causing toxicity to the tissue and bone and component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery and its attendant complications in patients.

88.     At all times relevant to this action, Defendants failed to acknowledge the manufacturing defects in the Devices due to poor and inadequate quality assurance procedures and due to a wanton and reckless disregard for public safety. Defendants also failed to implement or utilize adequate safeguards, tests, inspections, validation, monitoring and quality assessments to ensure the safety of the Devices.

89.     At the time the Devices were manufactured and sold to patients, including Plaintiff, the Devices was defectively manufactured, packaged and unreasonably dangerous, and did not conform to the federal regulations subjecting patients to unreasonable risks of injury.

90.     At all times relevant to this action, Defendants' inadequate manufacturing processes also led to material flaws in the quality systems at its manufacturing, packaging, storage and distribution facilities.

91.     During manufacture and distribution of the Devices, Defendants failed in several ways, including, without limitation, by:

1.      failing to conduct adequate mechanical testing, including oxygen-resistance or other wear testing for the components, subassemblies, and/or finished Devices;

2.      failing to test an adequate number of sample devices on an ongoing basis;

3.      failing to take adequate steps to specifically identify failure modes with clarity and to suggest methods to monitor, avoid, and/or prevent further failures;

4.      failing to identify and/or note the significance of any testing that resulted in failure of the Devices;

5. failing to take corrective actions to eliminate or minimize further failures of the Devices;

6. failing to adequately explain packaging specifications for the components, subassemblies, and/or finished Devices;

7. failing to perform adequate quality control before the components, subassemblies, and/or finished Devices were distributed;

8. failing to properly address reports from their sales representatives who reported their observations while attending revision surgeries where evidence of polyethylene debris and osteolysis was apparent and noted by the surgeons and the sales representatives themselves;

9. failing to timely implement corrective action and investigations to understand the root cause of these failures while continuing to sell the components knowing they would be implanted into the bodies of thousands of people; and

10. becoming aware of the potential cause or causes but unreasonably avoiding informing patients and surgeons and delaying the ability to minimize damages as the devices continued to degrade and do damage in the patients' bodies.

92. On or before the date of Plaintiff's initial knee replacement surgery, namely July 1, 2016, Defendants knew or should have known the Devices were failing and causing serious complications after implantation in patients.

93. Such complications included, but were not limited to, catastrophic polyethylene wear including the deposition of plastic particulate wear debris throughout the knee, a high rate of component loosening, and overall early system failure resulting in tissue destruction, osteolysis, and other injuries causing severe pain, swelling, instability and dysfunction in the knee and leg necessitating revision surgery.

94. Defendants as manufacturers of orthopedic devices know that each surgery, especially a revision surgery, is always more complicated than an initial knee replacement surgery and is fraught with serious risks of infection, anesthesia errors, dislocations and other serious complications that should be avoided.

95. Defendants, however, ignored reports of early failures of their Devices and failed to promptly investigate the cause of such failures or issue any communications or warnings to orthopedic surgeons and other healthcare providers.

96. Before the date of Plaintiff's initial knee replacement surgery, Defendants knew or should have known that the Devices were defective and unreasonably dangerous to patients, that the product had an unacceptable failure and complication rate, and that the product had a greater propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 23 of 70 PageID #: 30

## TPG DEFENDANTS' ACQUISITION AND CONTROL OF EXACTECH

### TPG's Control over the Acquisition of Exactech

97.    On October 22, 2017, Defendant EXACTECH submitted a Form 8-K Report to the SEC, reporting that it had entered into an Agreement and Plan for Merger ("Merger Agreement") with Defendant OSTEON ("Parent") and Defendant MERGER, a corporation and wholly owned subsidiary of Parent.

98.    The October 22, 2017 Report describes the parties to the merger and financing of Defendant EXACTECH.

99.    The Merger Agreement stated that Defendants EXACTECH and MERGER will be merged, and Defendant EXACTECH will be the surviving entity and a wholly-owned subsidiary of Defendant OSTEON.

100.    The aforementioned October 22, 2017 8-K Report contains a letter from Michael LaGatta, setting forth the commitments of TPG Partners VII, LP, to purchase certain equity interests of Parent ("Letter Agreement").

101.    The Letter Agreement was signed by Michael LaGatta on behalf of TPG Partners VII, LP and also "Agreed to and Accepted" on behalf of Parent by Michael LaGatta.

102.    As noted above, Mr. LaGatta was a full-time employee of TPG, who was an active member of numerous subsidiaries and affiliates of TPG, having e.g., signed documents in his capacity as Vice President for TPG Global, LLC, TPG Holdings, LP, TPG Partner Holdings, LP, TPG Group Advisors (Cayman), Inc., Osteon Holdings, LP ("Parent"), and Osteon Merger Sub, Inc.

103.    TPG Capital, LP (now Defendant TPG, Inc.) negotiated the terms of the merger of Defendant EXACTECH, as it controlled Defendant OSTEON and Defendant MERGER.

104. TPG Capital LP (now Defendant TPG, Inc.) also organized and directed the financing of the merger of Defendant EXACTECH through TPG Partners VII, LP, which served as the financing entity for the merger and is controlled by TPG, Inc.

Defendant TPG'S Control over Its Affiliates

105. Osteon Holdings, LP (the predecessor entity of Defendant OSTEON) and Defendant MERGER Sub, Inc. are referred to as "Affiliates" of TPG Capital, LP (now Defendant TPG, Inc.) in SEC filings related to the Merger.

106. Specifically, Defendant EXACTECH reported to the SEC that "Parent [Osteon Holdings LP, the predecessor entity of Defendant OSTEON Holdings Inc.] and Defendant MERGER are affiliates of global private equity firm TPG Capital LP." Exactech, Inc., Current Report (Form 8-K) (Oct. 22, 2017).

107. Similarly, on December 4, 2017, Defendant EXACTECH reported to the SEC that: "Exactech, Inc., . . . announced today that it has entered into an amendment to its merger agreement with TPG Capital and certain of its affiliates which was previously announced on October 23, 2017. Pursuant to the amended merger agreement, the Company's common stock outstanding immediately prior to the effective time of the merger . . . will be converted into the right to receive $49.25 per share in cash. This represents an increase of approximately 17.3% over the $42.00 per share merger consideration previously agreed to by Defendant EXACTECH and TPG Capital. TPG Capital has also increased its equity financing commitment to $737 million for purposes of consummating the merger. Defendant EXACTECH's Board has approved the amended merger agreement with TPG and has determined that it is advisable, fair to and in the best interest of Defendant EXACTECH and its shareholders. Defendant EXACTECH's Board hereby recommends to Defendant EXACTECH's shareholders that they vote to approve the merger agreement and the merger with TPG.\

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 25 of 70 PageID #: 32

108. TPG has arranged fully committed equity financing for the transaction and there is no financing condition to consummation of the merger with the Company. Early termination of the statutory waiting period under the Hart-Scott-Rodino Act was obtained on November 17, 2017 and, accordingly, there are no anti-competitive or other regulatory approvals needed to consummate the merger with TPG Capital's affiliate.

109. In a Form 8-K, dated February 13, 2018, filed with the SEC, Defendant EXACTECH reported: On February 14, 2018 (the "Closing Date"), pursuant to the terms of that certain Agreement and Plan of merger, dated as of October 22, 2107 (the "Original Merger Agreement"), as amended by Amendment No. 1 thereto ("Amendment No. 1 to Merger Agreement"), dated as of December 3, 2017 (as to amended, the "Merger Agreement") . . . the Company [Exactech, Inc.] became indirectly beneficially wholly owned by affiliates of TPG Capital (the "TPG Investors") and certain management shareholders of the Company.

110. The Securities Act of 1933 defines an Affiliate as an entity that "directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person [entity] specified." 17 C.F.R. § 230.405 Definitions of terms (emphasis added).

111. Osteon Holdings, LP (predecessor entity of Defendant OSTEON) and Defendant MERGER were the corporate vehicles used by TPG Capital LP (now Defendant TPG, Inc.) to consummate the merger with Defendant EXACTECH.

112. Both of these entities were affiliates of TPG Capital, LP (now Defendant TPG, Inc.) and, therefore, controlled by TPG Capital, LP (now Defendant TPG, Inc.) under the definition of "Affiliate" as set forth in the Securities Act of 1933.

113.   Since Defendant MERGER was "merged with and into Defendant EXACTECH, Defendant EXACTECH is considered an affiliate controlled by TPG Capital, LP (now Defendant TPG, Inc.), pursuant to the merger transaction. TPG Capital, LP (now Defendant TPG, Inc.) accordingly is liable for the improper actions of Defendant EXACTECH that occurred prior to the Merger and also actions that Defendant OSTEON was aware of and directed subsequent to the Merger.

114.   In connection with the Exactech Merger, on or about October 22, 2017, a Rollover and Voting Agreement was executed, naming William Petty, Betty Petty, David W. Petty, and Prima Investments Limited Partnership (f/k/a Petty Family Investments, LP) as Shareholders in Osteon Holdings, LP. Osteon Holdings, LP was the "Parent" to the Merger. On or about December 3, 2017, an amendment to this Rollover and Voting Agreement, was executed.

115.   As part of the December 3, 2017 amendment ("Amendment 1"), Miller Family Holdings, LLC, Bruce Thompson, Joel Phillips, Donna Edwards, Chris Roche, and Steve Szabo became shareholders in Osteon Holdings, LP.

116.   According to Schedule A-1 of Exhibit A of the Rollover and Voting Agreement, only those listed on the Agreement, i.e., Defendant EXACTECH pre-merger executives and officers, received subject shares in Osteon Holdings, LP, in exchange for some of their Exactech shares in the Exactech Merger. For example, Dr. William Petty held 102,400 rollover shares in the Exactech Merger, which were exchanged for 5,821,546 shares of Class B common stock of Osteon Holdings, LP.

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 27 of 70 PageID #: 34

117.    Osteon Holdings, LP was a limited partnership. Under basic tenets of corporate law, Limited Partnerships do not have stock or stockholders. A Limited Partnership has a general partner, who takes unlimited liability for a company's obligations, and one or more limited partners – whose liabilities are limited to the size of their investments.

118.    On or about February 14, 2018, an amendment to the closing Transaction Statement (the "Final Amendment") was executed in connection with the Exactech Merger.

119.    Prior to the execution of the Final Amendment, all original merger agreements and amendments referred to the Parent as Osteon Holdings, LP.

120.    In the Final Amendment, the Parent is no longer referred to as Osteon Holdings, LP. Instead, the Final Amendment refers to the Parent as Osteon Holdings Inc.

121.    There is no disclosure explaining why the original Parent company, Osteon Holdings, LP was converted to Osteon Holdings, Inc.

122.    During the merger negotiations between April 2017 and December 2017, including various amendments to original agreements, Defendant EXACTECH's Executive Chairman Dr. William Petty and founding shareholders ("the Rollover Investors") "had been approached by and had held discussions with TPG . . . to inquire whether such shareholders would be willing to exchange, in connection with the merger, a portion of their shares of Common Stock for a new class of equity securities in [Osteon Holdings LP]," an affiliate of TPG Capital, LP (now Defendant TPG, Inc.). See Exactech, Inc., Proxy Statement (Form DEF 14A), at 34 (Jan. 16, 2018).

123.    "As a condition to receiving new equity securities in [Osteon Holdings, LP], the Rollover Investors have agreed to vote all of their shares of Common Stock [in Exactech] "FOR" the proposal to approve the Merger Agreement and the merger [with TPG Capital, LP (now Defendant TPG, Inc.)]." Id. at 96.

124.    "TPG and [its outside Counsel] Ropes & Gray, exchanged seven drafts of the Original Merger Agreement, as well as multiple issues lists, and held multiple telephonic conferences to discuss and negotiate the terms and conditions of the Original Merger Agreement. . ." and reviewed several drafts of the Original Rollover & Voting Agreement ("Rollover Agreement"). Id. at 29-30.

125.    As a result of these discussions, Osteon Holdings, LP and the pre-merger Exactech Chairman, founding shareholders and other officers, executed the Rollover Agreement on October 22, 2017, as amended on December 3, 2017.

126.    The Amended Rollover Agreement added an "automatic conversion" paragraph that allowed Defendant EXACTECH's Chairman, founding shareholders, and other officers to automatically convert their individually owned shares in Osteon Holdings, LP "immediately prior to an initial public offering" to shares in an anticipated Initial Public Offering ("IPO") involving TPG Capital, LP, its partners, and affiliates.

127.    TPG, Inc. completed its IPO on January 13, 2022.

128.    Osteon Holdings, LP, a TPG controlled affiliate and party to the Rollover Agreement, had no authority to commit future TPG, Inc. IPO shares through an automatic conversion to Osteon Holdings, LP shareholders. As stated before, Osteon Holdings, LP was converted to Osteon Holdings, Inc.

129.    TPG Capital, LP (now Defendant TPG, Inc.), through its common officers with its affiliates, had the authority to implement the automatic conversion of future shares under the anticipated IPO plan, since TPG, Inc. did not exist at the time the Rollover Agreement was executed.

130.    TPG Capital, LP (now Defendant TPG, Inc.) officers are also officers of Osteon Holdings, LP (now Osteon Holdings, Inc.). In effect, TPG and its affiliates operate as a single enterprise under the global brand name, "TPG." Furthermore, as demonstrated by the Rollover

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 29 of 70 PageID #: 36

Agreement and the Defendant EXACTECH January 16, 2018 Proxy Statement, TPG Capital, LP (now Defendant TPG, Inc.) controlled Osteon Holdings, LP (now Osteon Holdings, Inc.) and the negotiations related to the Exactech merger through its common officers, general counsel, and outside counsel.

TPG's Control over the Management Agreement

131. Per the 2017 Amendment to the Rollover and Voting Agreement, Defendant EXACTECH would operate using TPG's "customary management agreement." This management agreement did not require unanimous consent from the Defendant EXACTECH board. This is notable, because as set forth below, TPG placed many of its own employees on Defendant EXACTECH's Board and in key positions throughout the company.

132. TPG requiring Defendant EXACTECH to use TPG's management agreement demonstrates that TPG has control over the management of Defendant EXACTECH.

133. The 2017 Amendment to the Rollover and Voting Agreement also said that employment agreements with TPG or its affiliates did not require unanimous consent from the Defendant EXACTECH board.

134. TPG requiring control of employment agreements that involve any affiliates demonstrates that it has direct control over employees at Defendant EXACTECH.

Co-Mingling Liability

135. The Merger Agreement demonstrates that the parent company, Osteon Holdings, Inc., assumed certain liabilities of Defendant EXACTECH.

136. The Merger Agreement provides that Defendants EXACTECH and OSTEON will jointly participate in the defense or settlement of any security holder litigation against Defendant EXACTECH or its directors related to the merger.

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 30 of 70 PageID #: 37

137. The Merger Agreement provides that Defendant EXACTECH cannot enter into any settlement agreement regarding any security holder litigation against it or its directors relating to particular transactions without Defendant OSTEON's prior written consent.

138. Defendants OSTEON, MERGER and non-Defendant TPG Partners VII, LP are named as affiliates and grouped together as "the TPG Parties" in the Final Amendment of the SEC Rule 13E-3 Transaction Statement that they jointly filed with Defendant EXACTECH on February 14, 2018.

139. On the SEC's Notice of Exempt Offering of Securities, six directors and seven officers of TPG are listed as "related persons" in connection with Osteon Holdings, LP.

140. "The TPG Parties," as described in the Final Amendment of the SEC Rule 13E-3 Transaction Statement, should be grouped together for purposes of liability under the Merger Agreement.

141. The language of the Merger Agreement and SEC filings demonstrates that "the TPG parties" and Defendant EXACTECH co-mingle liabilities, share economic resources, and conduct and manage operations through their common officers and directors.

TPG's Post-Merger Control of Defendant EXACTECH

142. TPG is not a passive investor in Defendant EXACTECH.

143. TPG has undertaken active management of Defendant EXACTECH as part of its ownership of the company.

144. TPG promotes its "distinctive," "alternative," and "unique" approach to growing the companies that it invests in.

145. Part of TPG's promoted approach is being "involved in building really special companies."

Case 1:24-cv-03782-NGG-MMH   Document 1-1   Filed 05/14/24   Page 31 of 70 PageID #: 38

146. "Building really special companies" requires more than providing money.

147. Another part of TPG's promoted "unique approach" is bringing a "family office" and "entrepreneurial" perspective to the companies that it partners with.

148. TPG promotes its ability to "create products and services [that have] delivered breakthrough innovation" in the healthcare industry.

149. In the healthcare industry specifically, TPG emphasizes its "differential insights."

150. TPG played an active role in selecting the people who would run the day-to-day operations of Defendant EXACTECH after the merger.

151. In meetings during June and July of 2017, TPG told Defendant EXACTECH that it was important for Jeffrey R. Binder (a TPG advisor) to have a central role in any potential transaction between Defendant EXACTECH and TPG.

152. Jeffrey R. Binder and Daniel Hann both advised TPG Capital on its merger with Defendant EXACTECH.

153. Jeffrey R. Binder became CEO of Defendant EXACTECH in March 2022 after joining Dr. William Petty as co-executive Chairman of Defendant EXACTECH in 2018.

154. Daniel Hann became Senior Vice President of Business Development of Defendant EXACTECH.

155. After an Defendant EXACTECH Board of Directors meeting in September 2017, the company's lead independent director, Mr. James G. Binch, contacted another director, Mr. Todd Sisitsky (TPG President and Co-Managing Partner), to tell him that TPG was now permitted to speak with Defendant EXACTECH's founding shareholders and management team regarding equity participation, employment, and other arrangements for after the merger.

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 32 of 70 PageID #: 39

156.    Eleven pre-merger officers or directors of TPG became officers or directors of Defendant EXACTECH post-merger.

157.    TPG advisors have continued to exert direct control over Defendant EXACTECH since the merger.

158.    Defendant HOLDINGS is the certificate holder on a Certificate of Insurance associated with Defendant EXACTECH. Coverage held by Defendant HOLDINGS includes, but is not limited to, products liability.

159.    TPG advisors have served in at least six leadership positions for Defendant EXACTECH: three officer positions-filled by Jeffrey R. Binder, Daniel P. Hann, and Kerem Bolukbasi-and three director positions-filled by Kendall Garrison, John Schilling, and Todd Sisitsky.

160.    One-third of the nine-member Defendant EXACTECH Board of Directors is composed of TPG employees.

161.    As further evidence of TPG's control over Defendant EXACTECH, orthopedic surgeons may be incentivized to utilize Defendant EXACTECH products in exchange for shares of Osteon Holdings, LP. For example, in a 2021 American Association of Hip and Knee Surgeon disclosure report, a Massachusetts-based orthopedic surgeon who is an Defendant EXACTECH "paid consultant" with "IP royalties" disclosed that he has "stock or stock options" in "Osteon Holdings."

TPG's Direct Involvement in Decision Making Related to the Recall of Exactech's Knee Devices

162.    Upon information and belief, TPG's advisors and Officers directed the Defendant EXACTECH's Knee Devices recalls caused by accelerated polyethylene wear.

163.    TPG Officers and Directors are also Officers and Directors of Defendant OSTEON and Defendant EXACTECH. Therefore, TPG was directly involved in decision making related to the recalls.

164.    Upon information and belief, in 2017 or 2018, during due diligence prior to the acquisition of Defendant EXACTECH or shortly after the acquisition of Defendant EXACTECH, TPG knew or should have known of the clinical evidence of early onset failures of Defendant EXACTECH Devices and Defendant EXACTECH's noncompliance with federal regulations and current good manufacturing practices.

165.    Public records reveal that Defendant EXACTECH had a history of device failures that may have required a voluntarily recall before the merger and after the merger.

166.    Upon information and belief, in order to increase the value of TPG's ownership of Defendant EXACTECH, TPG chose to continue selling Defendant EXACTECH's Knee Devices despite research and clinical evidence demonstrating significant product defects that were harming patients with those devices implanted in their bodies.

167.    TPG's involvement in Defendant EXACTECH presentations after the merger demonstrates that TPG was aware of the clinical evidence of early onset failures of the Defendant EXACTECH's Devices and participated in the corrective action plan.

168.    The first recall of Optetrak and Truliant devices was not issued until over three years after the 2018 Merger.

169.    In November 2021, Defendant EXACTECH CFO and Treasurer Kerem Bolukbasi ("Bolukbasi') gave a "cash flow profile" presentation to the Defendant EXACTECH's Board of Directors, including TPG board members and advisors, regarding the August 2021 Defendant EXACTECH recall which "created significant financial difficulty for Exactech . . . reflecting an

estimated $60 million cash burn during 2022."[1]

170.    Following this presentation and disclosure, Bolukbasi was terminated by TPG and Defendant EXACTECH.

171.    To effectuate Bolukbasi's termination, Darrin Johnson conferred with TPG employee, and Defendant EXACTECH board member, John Schilling.

172.    Also in November 2021, Karen Golz, a member of the Defendant EXACTECH Board of Directors, was appointed to the Board of Directors of another company, iRobot. The iRobot press release announcing Ms. Golz's appointment stated that Ms. Golz also serves on the Board of Directors of "Osteon Holdings/Exactech, a private company controlled by TPG."

173.    At all stages, TPG has been directly involved in and controlled the decision making regarding when and how to recall Defendant EXACTECH's defective Knee Devices and alert the patients and surgeons to Defendant EXACTECH's years' long failure to manufacture safe devices and comply with good manufacturing practices.

## PLAINTIFF HARRY LIPMAN'S IMPLANTS AND REVISION SURGERY

174.    On July 1, 2016, Plaintiff HARRY W. LIPMAN underwent a left knee replacement surgery at the Hospital for Special Surgery in New York, New York where his left knee was implanted with the Exactech Optetrak LPI - ARC system which included the Optetrak Logic Trapezoidal Tibial Base (a/k/a "The Devices") and well as the Exactech - Optetrak Logic Femoral Component (Size 4, Left, Posterior Stabilized, Lot#: 406679924102010010240); Exactech - Optetrak Logic Trapezoidal Tibial Base (Size 4F/4T, Cemented, Lot#: 439073324102012414040); Exactech - Optetrak Logic (Size 4, 11mm, PS, Constrained, Lot#: 123) and Exactech - Three-Peg Cemented

---

[1] A cash burn means that the company would be forced to spend large sums of money in connection with the August 2021 recall.

Patella (32mm, Lot#: 43697112412000232).

175.    On or about May 6, 2021, plaintiff sought medical attention from Dr. Thomas Sculco, who was the HSS surgeon who performed and or supervised the July 1, 2016, total left knee replacement.

176.    Plaintiff sought said medical attention due to a slowly developing set up symptoms including but not limited to pain, swelling and stiffness in the left knee.

177.    Plaintiff had no idea and had no reason to believe that the symptoms were related to anything other than normal wear and tear on his knee.

178.    The said set of symptoms continued to progress and did not respond to conservative non-surgical treatment in any significant manner.

179.    On April 18, 2022, Plaintiff received letter from HSS stating "the manufacturer of the implant used in [Plaintiff's] knee placement has issued a recall of one component of the implant." The letter, which upon information and belief was drafted by Defendant EXACTECH for distribution by HSS, went on to say that Plaintiff's knee prosthesis involved the utilization of a polyethylene tibial liner or insert ... manufactured by Exactech Inc." The letter further stated

> "During a recent review of its knee implant manufacturing process, Exactech learned of an issue with the packaging of the plastic insert which can allow oxygen from the air into the plastic insert prior to it being implanted. If a large amount of oxygen diffuses into the plastic insert while it's being stored and before it is implanted, this can lead to a process called oxidation, which can cause the plastic to wear out earlier than expected or to become damaged after it is implanted into the patient's body.

180.    Upon receipt of this alarming letter, Plaintiff promptly made an appointment with Dr. Sculco.

181. After being examined and in light of an MRI of the subject knee, it was determined that Plaintiff needed a total left knee replacement revision surgery, which was scheduled for, and performed and or supervised by Dr. Sculco on May 25, 2022.

182. On May 25, 2022, the whole of the Exactech Optetrak LPI - ARC system was removed from Plaintiff's left knee and replaced with a prosthesis system from Stryker.

183. Plaintiff suffered through and extensive rehabilitation process but did not respond positively to that process and, upon further consultation with Dr. Sculco, was advised to seek an arthroscopic debridement of the left knee due to continuing symptoms and problems caused by the failure of Defendant EXACTECH's devices.

184. The arthroscopic debridement procedure was scheduled for, and was performed y Dr. Sculco on April 23, 2023.

185. Plaintiff continues to suffer loss of range of motion, pain and lack of mobility due to Defendants' malfeasance.

186. Defendants, through their affirmative misrepresentations and omissions, actively and fraudulently concealed from Plaintiff and Plaintiff's health care providers the true and significant risks associated with the Devices and the need to vigilantly do diagnostic procedures to promptly diagnose the insidious process of the toxic polyethylene particles degrading and causing osteolysis.

187. Defendants know that after the one-year checkup following a total knee arthroplasty, typically patients are not expected to return for monitoring absent problems. Thus, Defendants knew that—unless they informed surgeons to call their patients back for periodic radiologic monitoring—polyethylene chemical degradation and attendant osteolysis could be occurring unchecked until it reached the stage of severe bone loss.

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 37 of 70 PageID #: 44

188.    As a direct, proximate, and legal consequence of the defective nature of the Devices as described herein, Plaintiff HARRY W. LIPMAN has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

189.    As a further direct, proximate, and legal consequence of the defective nature of the Devices, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

## TOLLING OF STATUTE OF LIMITATIONS

### Latent Injury

196.    To the extent it is claimed that Plaintiff suffered symptoms prior to undergoing revision surgery, the statute of limitations is tolled because development of osteolysis, bone loss, and device loosening are latent conditions caused by years of exposure to toxic polyethylene wear debris that could not be appreciated until the date Defendant EXACTECH disseminated the information justifying its recall of the Exactech Knee Devices.

197.    As a plastic, polyethylene wear debris contains chemicals or additives and may contain impurities such as catalyst residues, unreacted monomers, or breakdown products which possess toxic properties that can adversely affect human health. See Matthias C. Rillig et al., The Global Plastic Toxicity Debt, 55 ENV'T. SCI. & TECH. 2717, 2717–19 (2021).

198.    As described above, such toxic effects on the human body include, but are not limited to, osteolysis, tissue necrosis, and destruction of the bony integration between the component parts of the prosthetic and the patient's anatomy.

Case 1:24-cv-03782-NGG-MMH          Document 1-1          Filed 05/14/24          Page 38 of 70 PageID #: 45

199. Prior to Defendant EXACTECH initiating its recall and disseminating information about the recalls to Plaintiff, technical, scientific, or medical knowledge and information sufficient to ascertain the cause of the failure of the Exactech Knee Devices had not been known.

200. Thus, Plaintiff exhibited due diligence and did not possess "technical, scientific, or medical knowledge" and information sufficient to ascertain the cause of his injuries until after Defendant EXACTECH recalled their Exactech Knee Devices.

201. Additionally, counsel for Defendants has tolled the Statute of Limitations during settlement negotiations such that this action is filed timely.

## Fraudulent Concealment

201. Defendant EXACTECH, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff and Plaintiff's healthcare providers the defects in and true and significant risks associated with Exactech's Knee Devices, claiming any failures were due to surgical technique, positioning, or patient characteristics.

202. Following implantation of the Devices, Plaintiff and Plaintiff's healthcare providers relied on Defendant EXACTECH's continued representations that the Devices, including their polyethylene components, had excellent long-term clinical outcomes.

203. Defendant EXACTECH made these representations with knowledge of their falsity, an intent to defraud, and/or disregard for the truth given its knowledge of reports of high failure rates.

204. Furthermore, following implantation of the Devices, Plaintiff and Plaintiff's healthcare providers relied on Defendant EXACTECH to provide them with urgent safety information regarding Exactech's Knee Devices, including recalls, communications regarding defects and increased rates of failure, and warnings and instructions on how to assess, diagnose, and mitigate risks associated with the defects in these Devices.

205. Although clinical evidence demonstrated that the polyethylene used in Exactech Knee Devices were failing at a rate higher than promoted, with instances of excessive revision rates due to device loosening and polyethylene wear, Defendant EXACTECH failed to initiate recalls earlier or issue any communications to healthcare providers that Exactech Knee Devices were defective and patients should be monitored.

206. Until recently, Defendant EXACTECH lacked highly-cross linked polyethylene for its Knee Devices. Accordingly, without a viable substitute, earlier disclosure of these failure rates could have negatively impacted Defendant EXACTECH's ongoing business and sale to TPG in 2017/2018.

207. As a result of Defendant EXACTECH's actions, omissions, and misrepresentations, Plaintiff and Plaintiff's healthcare providers were unaware, and could not have reasonably known, learned, or discovered that any Plaintiff's symptoms or radiological findings indicative of a potential problem with Plaintiff's joints were the result of defects in Exactech's Knee Device.

208. Furthermore, had Defendant EXACTECH not actively concealed evidence of growing reports of accelerated polyethylene wear and Device failures, Plaintiff's surgeon would have not implanted the Devices, and for those patients already implanted with Defendant EXACTECH's Devices, their surgeons would have initiated monitoring for device failures at an earlier time.

209. Such intervention would have led to an earlier diagnosis of loosening and bone loss, and earlier removal of the Exactech Knee Devices, thereby reducing damage to bone and tissue.

210. As a result of Defendant EXACTECH's actions, omissions, and misrepresentations, many individuals underwent revision surgeries subjecting them to new damages, such as in Plaintiff's case two additional surgeries.

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 40 of 70 PageID #: 47

211. As a result of Defendant EXACTECH's actions, omissions, and misrepresentations, Plaintiff and Plaintiff's healthcare providers were unaware, and could not have reasonably known, learned, or discovered through reasonable diligence, that Plaintiff had been exposed to the risks identified herein, and that those risks were the result of defects in Exactech's Knee Devices.

212. Accordingly, no limitations period should accrue until such time as Plaintiffs knew or reasonably should have known of some causal connection between Plaintiff being implanted with Exactech's Knee Devices, and the resulting harm later suffered by Plaintiff as a result and by reason of Defendant EXACTECH's fraudulent concealment.

213. Additionally, Defendants are equitably estopped from asserting any limitations defense by virtue of their fraudulent concealment and other misconduct as described herein.

214. Further, the limitations period should be tolled under principles of equitable tolling.

CAUSES OF ACTION

FIRST CAUSE OF ACTION

STRICT LIABILITY—MANUFACTURING DEFECT

(Against Exactech Defendants and TPG Defendants[2])

215. Plaintiffs hereby repeat and re-allege by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

216. Prior to Plaintiff's initial left knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

---

[2]Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under any particular state's governing law.

217. Defendants had a duty to manufacture the Devices in a manner that prevents unreasonable risk of harm or injury to users and patients, including Plaintiff.

218. Defendants had a duty to distribute, market, and/or sell the Devices without manufacturing and related packaging defects to prevent an unreasonable risk of harm or injury to users and patients, including Plaintiff.

219. The Devices manufactured by the Defendants were not reasonably safe for their expected, intended, and/or foreseeable uses, functions, and purposes.

220. The Devices were not reasonably safe as manufactured, packaged, distributed, marketed and/or sold by the Defendants.

221. The defects in manufacture of the Devices were a substantial factor in causing Plaintiff's injuries.

222. At all times herein mentioned, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices, which was implanted in Plaintiff, such that it was dangerous, unsafe, and defective in manufacture. The defects in manufacture include but are not limited to: failure to package the polyethylene components of the Devices in vacuum bags that contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery;

1. the materials used to package the Devices were of an inferior grade or quality;

2. that the Devices as manufactured differed from Defendants' intended specifications;

3.       that Defendants failed to measure and/or test an adequate number of samples of Devices on an ongoing basis;

4.       that Defendants failed to take corrective actions to eliminate or minimize further failures of the Devices;

5.       that Defendants failed to perform adequate quality control or other such testing on the polyethylene inserts used in the Devices to ensure they complied with required specifications and were not prematurely degrading while stored;

6.       failure to select appropriate third parties to package the polyethylene inserts used in the Devices;

7.       failure to properly supervise and monitor the packaging of the polyethylene inserts used in the Devices;

8.       failure to exercise sufficient quality control to ensure the polyethylene inserts in the Devices were safe for implantation in users and patients and would not degrade abnormally under average and regular use; and

9.       that Defendants violated applicable state and federal laws and regulations; and in all other ways.

223.    Defendants knew or reasonably should have known and been aware that the Devices were defectively manufactured.

224.    The manufacturing defects in the Devices existed when the Devices left the Defendants' control.

225.    Plaintiff's physicians implanted the Devices in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 43 of 70 PageID #: 50

226.    The Devices as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

227.    As alleged herein, Defendants knew or had reason to know that the Devices caused an increased risk of harm to the Plaintiff and other consumers due to the Devices's propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

228.    The manufacturing defects of the Devices presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

229.    The manufacturing defects of the Devices presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when they were used and operated in a manner that was foreseeable to Defendants.

230.    Plaintiff could not, by the exercise of reasonable care, have discovered the manufacturing defect and perceived its dangers or avoided injury.

231.    The Defendants are strictly liable for the defective manufacture of the Devices; the distribution, marketing, and/or sale of the defectively manufactured Devices; and the injuries sustained by Plaintiff.

232.    By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 44 of 70 PageID #: 51

233. By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

234. As a direct, proximate, and legal consequence of the defective nature of the Devices as described herein Plaintiff has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

235. As a further direct, proximate, and legal consequence of the defective nature of the Devices, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

236. Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

SECOND CAUSE OF ACTION STRICT LIABILITY—DESIGN DEFECT

(Against Exactech Defendants and TPG Defendants[3])

237. Plaintiffs hereby repeat and re-allege by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

238. Prior to Plaintiff's initial knee surgery, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices for implantation into

[3]Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under any particular state's governing law.

consumers, such as Plaintiff, by orthopedic surgeons in the United States.

239. Defendants had a duty to design and package the Devices in a manner that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

240. Defendants had a duty to distribute, market, and/or sell the Devices with a design that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

241. The design of the Devices and corresponding packaging is defective and not reasonably safe for its expected, intended, and/or foreseeable uses, functions, and purposes.

242. The Devices and corresponding packaging are not reasonably safe as designed, distributed, marketed, delivered and/or sold by Defendants.

243. The defective design of the Devices and packaging received by Plaintiff's implanting surgeon was a substantial factor in causing Plaintiff's injuries.

244. At all times relevant to this action, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices, which was implanted in Plaintiff, such that it was dangerous, unsafe, and defective in design. The defects in the design include but are not limited to:

1. that the Devices have a propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients;

2. failure to design the packaging for the polyethylene components of the Devices in vacuum bags that contain a secondary barrier layer containing

ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery;

3. that the materials used within the Devices and packaging were of an inferior grade or quality than advertised and promoted by Defendants;

4. Defendants failed to conduct adequate testing, including wear or other testing, on components, subassemblies and/or the finished Devices as packaged and distributed;

5. Defendants failed to test an adequate number of samples of Devices on an ongoing basis;

6. Defendants failed to take adequate steps to specifically identify failure modes with the Devices with clarity and to suggest methods to monitor, avoid, and/or prevent further failures;

7. Defendants failed to identify and/or note the significance of any testing that resulted in failure of the Devices;

8. Defendants failed to take corrective actions to eliminate or minimize further failures of the Devices;

9. Defendants failed to adequately design packaging specifications for the components, subassemblies, and/or the finished Devices;

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 47 of 70 PageID #: 54

245.    The polyethylene material used in the Devices in conjunction with the inferior vacuum bags caused and/or contributed to the devices having a higher failure rate than other similar devices available at the time the Devices were put on the market.

246.    The polyethylene material used in the Devices in conjunction with the inferior vacuum bags caused and/or contributed to the devices having a shorter effective lifetime than other similar devices available at the time the Devices were put on the market.

247.    The Defendants' method of designing the polyethylene insert and packaging increased the risk of users and patients suffering from pain, discomfort, injury, and the need for revision surgery; and that Defendants violated applicable state and federal laws and regulations; and in all other ways.

248.    Defendants knew or reasonably should have known and been aware that the Devices and packaging were defectively designed.

249.    The design defects in the Devices and packaging existed when the Devices left the Defendants' control.

250.    Plaintiff's physicians implanted the Devices in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

251.    The Devices as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

252.    As alleged herein, Defendants knew or had reason to know that the Devices caused an increased risk of harm to the Plaintiff and other consumers due to the Devices's propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for

Case 1:24-cv-03782-NGG-MMH   Document 1-1   Filed 05/14/24   Page 48 of 70 PageID #: 55

revision surgery in patients.

253. The Devices and their packagings as designed carried risks that were outweighed by any utility of the design of the Devices and packaging because when paired together, the Devices and packaging were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

254. At no time prior to April 2022, did Plaintiff have reason to believe that the Devices and the packaging in which they were received were in a condition not suitable for proper and intended use.

255. The Devices and packaging were defective in design and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the foreseeable risks exceeded or outweighed the purported benefits associated with the Devices.

256. Feasible safer alternative designs providing the same functional purpose were available to the Defendants at the time the Devices were designed and packaged and offered for sale in the market.

257. For example, Defendants could have utilized vacuum bags containing a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the polyethylene components from undergoing increased oxidation according to their own admissions.

258. The design defects of the Devices and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

259. The design defects of the Devices and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when they were used and operated in a manner that was foreseeable to Defendants.

260. Plaintiff could not, by the exercise of reasonable care, have discovered these design defects and perceived their dangers or avoided injury.

261. Defendants are strictly liable for the defective design of the Devices; defective design of the packaging of the Devices; the distribution, marketing, and/or sale of the Devices; and the injuries sustained by Plaintiff.

262. By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

263. By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

264. As a direct, proximate, and legal consequence of the defective nature of the Devices as described herein, Plaintiff HARRY W. LIPMAN has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

265. As a further direct, proximate, and legal consequence of the defective nature of the Devices, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

266. Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 50 of 70 PageID #: 57

THIRD CAUSE OF ACTION

STRICT LIABILITY—FAILURE TO WARN

(Against Exactech Defendants and TPG Defendants[4])

267. Plaintiff hereby repeats and re-alleges by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

268. Prior to Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

269. Defendants had a duty to provide adequate warnings regarding the Devices in a manner that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

270. Defendants had a duty to distribute, market, and/or sell the Devices with adequate warnings that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

271. The warnings that accompanied the Devices and corresponding packaging were defective, thereby making the product not reasonably safe for its expected, intended, and/or foreseeable uses, functions and purposes.

272. The Devices and corresponding packaging are not reasonably safe as labeled, distributed, marketed, delivered and/or sold by Defendants.

---

[4]Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under any particular state's governing law.

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 51 of 70 PageID #: 58

273. Inadequate labeling accompanying the Devices and packaging received by Plaintiff's implanting surgeon was a substantial factor in causing Plaintiff's injuries.

274. At all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices, which were implanted in Plaintiff, such that it was dangerous, unsafe, and defective.

275. The Devices were defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or its sales force to physicians and patients with or about the Devices failed to adequately convey the potential risks and side effects of the Devices and the dangerous propensities of the Devices, which risks were known or were reasonably scientifically knowable to Defendants.

276. In particular, Defendants failed to adequately disclose the Devices's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, bone loss, osteolysis, and other injuries as well as the need for revision surgery in patients.

277. Defendants consciously disregarded the increased risks of harm by failing to adequately warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Devices; and continuing to market, promote, sell, and defend the Devices until the very recent recall.

278. Defendants knew or reasonably should have known and been aware that the Devices and packaging contained inadequate warnings.

279. The inadequate warnings for the Devices existed when the Devices left the Defendants' control.

280. Plaintiff's physician implanted the Devices in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

281. The Devices as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

282. As alleged herein, Defendants knew or had reason to know that the Devices caused an increased risk of harm to the Plaintiff and other consumers due to the Devices's propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

283. The Devices that were labeled, manufactured, distributed, and sold by the Defendants to Plaintiff were in a defective condition that was unreasonably dangerous to any user or ordinary consumer of the Devices, including Plaintiff.

284. The labeling defects of the Devices and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

285. The labeling defects of the Devices and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when they were used and operated in a manner that was foreseeable to Defendants.

286. Plaintiff could not, by the exercise of reasonable care, have discovered these defects and perceived their dangers or avoided injury.

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 53 of 70 PageID #: 60

287. Defendants failed to issue new warnings or initiate recalls timely as to help minimize the damage and bone loss and other related symptoms occurring in patients, including Plaintiff.

288. Defendants are strictly liable for providing inadequate warnings accompanying the Devices and packaging of the Devices; the distribution, marketing, and/or sale of the Devices; and the injuries sustained by Plaintiff.

289. By reason of the foregoing acts, omissions, and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

290. By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

291. As a direct, proximate, and legal consequence of the defective nature of the Devices as described herein, Plaintiff HARRY W. LIPMAN has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

292. As a further direct, proximate, and legal consequence of the defective nature of the Devices, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

293. Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

## FOURTH CAUSE OF ACTION

## NEGLIGENCE

(Against Exactech Defendants and TPG Defendants[5])

294.    Plaintiff hereby repeats and re-alleges by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

295.    Prior to Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

296.    Prior to, on, and after the dates of Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants had a duty to exercise reasonable care in testing, study, research, design, formulation, manufacture, inspection, labeling, packaging, promotion, advertisement, marketing, distribution, and sale of the Devices for implantation into consumers, such as Plaintiff, by physicians and surgeons in the United States.

297.    Prior to, on, and after the dates of Plaintiff's initial knee surgery, Defendants breached this duty and failed to exercise reasonable care and were grossly negligent and careless in the testing, study, research, design, formulation, manufacture, inspection, labeling, packaging, promotion, advertisement, marketing, distribution, and sale of the Devices.

298.    Following Plaintiff's initial knee surgery, Defendants breached this duty and failed to exercise reasonable care and were grossly negligent and careless in failing to recall the Devices.

---

[5]Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under any particular state's governing law.

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 55 of 70 PageID #: 62

299.    At all times material hereto, the Defendants had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers associated with the Devices.

300.    Defendants had access to registry data and were aware of complaints that the Devices caused serious complications including but not limited to polyethylene wear and/or other failure causing serious complications including component loosening, tissue damage, osteolysis, bone loss and the need for revision surgery in patients.

301.    Despite the fact that Defendants knew or should have known the Devices posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the Devices for implantation into consumers.

302.    Despite the fact that Defendants knew or should have known the Devices posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the Devices for implantation into consumers without revising any warning language or issuing an earlier recall.

303.    Defendants failed to advise surgeons and patients of the need for regular follow-up—beyond the ordinary practices after a total knee implant—to promptly detect polyethylene degradation and osteolytic failure and timely revise the Devices to prevent or at least minimize bone loss, osteolysis and related injuries.

304.    Defendants failed to exercise due care under the circumstances, and their gross negligence and recklessness includes the following acts and omissions:

    1.    Negligently failing to properly package the polyethylene components of the Devices;

Case 1:24-cv-03782-NGG-MMH   Document 1-1   Filed 05/14/24   Page 56 of 70 PageID #: 63

2. Negligently failing to select appropriate third parties to package the polyethylene inserts used in the Devices;

3. Negligently failing to properly supervise and monitor the packaging of the polyethylene inserts used in the Devices;

4. Negligently failing to properly and thoroughly select the material that would be used in the packaging of the Devices;

5. Negligently failing to properly and thoroughly select the materials that would be used in the Devices;

6. Negligently failing to properly and adequately test the Devices and their attendant parts before releasing the devices to market;

7. Negligently failing to conduct sufficient post-market testing and surveillance of the Devices;

8. Negligently failing to adequately prevent, identify, mitigate, and fix defective designs and hazards associated with the Devices in accordance with good practices;

9. Negligently designing, manufacturing, marketing, advertising, distributing, and selling the Devices;

10. Continuing to negligently manufacture, and distribute the Devices after the Defendants knew or should have known of their adverse effects and/or the increased early onset failure rates;

11. Negligently designing, manufacturing, marketing, advertising, distributing, and selling the Devices to consumers, including Plaintiff, without an adequate warning of the dangerous risks of the Devices;

12. Negligently failing to notify and warn the public, including Plaintiff, and physicians of reported incidents involving injury and the negative health effects attendant to the use of the Devices;

13. Negligently misrepresenting the safety of the Devices;

14. Negligently failing to provide warnings, instructions or other information that accurately reflected the risks of early failure of the Devices;

15. Negligently failing to provide warnings, instructions or other information that accurately reflected the risks of early degradation of the polyethylene substance in the Devices;

16. Negligently failing to exercise due care in the advertisement and promotion of the Devices;

17. Negligently disseminating information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the high early failure rate associated with the implantation of the Devices;

18. Aggressively promoting the Devices without proper warnings of the risk of early failure or material degradation in the average user;

19. Aggressively promoting the Devices even after Defendants knew or should have known of the unreasonable risks from implantation;

20. Negligently failing to warn consumers, doctors, users and patients that the Device would contain polyethylene materials not properly packaged and/or in accordance with Defendants' specifications;

21. Negligently diminishing or hiding the risks associated with the implantation of the Devices;

22.     Negligently failing to recall the Devices at an earlier date and institute a process to have patients notified; and

23.     Negligently violating applicable state and federal laws and regulations; and in all other ways.

305.    Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the Defective Implants, and otherwise distributing the Devices.

306.    By reason of the foregoing acts, omissions, and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

307.    By reason of the foregoing acts, omissions, and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

308.    As a direct and proximate result of Defendants' acts and omissions, including their failure to exercise ordinary care in the design, formulation, testing, manufacture, labeling, sale, and distribution of the Devices, Plaintiff HARRY W. LIPMAN was implanted with the Devices and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

309. As a further direct, proximate, and legal consequence of Defendants' acts and omissions, including their failure to exercise ordinary care in the design, formulation, testing, manufacture, labeling, sale, and distribution of the Devices, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

310. Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

## FIFTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

(Against Exactech Defendants and TPG Defendants[6])

311. Plaintiff hereby repeats and re-alleges by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

312. Prior to Plaintiff's initial knee surgery, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

313. Defendants owed a duty to orthopedic surgeons, other healthcare providers and to consumers of the Devices, including Plaintiff, to accurately and truthfully represent the risks of the Devices. Defendants breached their duty by misrepresenting and/or failing to adequately warn Plaintiff's orthopedic surgeon, the medical community, Plaintiff, and the public about the risks of the Devices, including the Devices's propensity to undergo substantial early polyethylene wear,

---

[6]Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under any particular state's governing law.

component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients, which Defendants knew or in the exercise of diligence should have known.

314. The Defendants, as the designers, manufacturers, sellers, promoters, and/or distributors of the Devices knew, or reasonably should have known, that health care professionals and consumers of the Devices would rely on information disseminated and marketed to them regarding the product when weighing the potential benefits and potential risks of implanting the Devices.

315. Defendants, as the designers, manufacturers, sellers, promoters, and/or distributors of the Devices and the associate packaging knew, or reasonably should have known, that the patients implanted with Devices would suffer early failure and require revision surgery because the information disseminated by Defendants and relied upon by health care professionals and consumers, including Plaintiff, was materially inaccurate, misleading, or otherwise false.

316. Defendants failed to exercise reasonable care to ensure that the information they disseminated to health care professionals and consumers concerning the quality and longevity of the Devices was accurate, complete, and not misleading. As a result, Defendants disseminated information to health care professionals and consumers that was materially inaccurate, misleading, false, and unreasonably dangerous to consumers such as Plaintiff.

317. Among Defendants' numerous misrepresentations and misleading omissions are Defendants' assurances that the Devices were safe, had an excellent performance record, and did not have a greater propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

318. Despite their knowledge of serious problems with the Devices, Defendants urged their sales representatives to continue marketing the Devices, and distributed medical literature, white papers, non-peer-reviewed studies, and other communications to surgeons in an effort to mislead them and the general public about the risks associated with the Devices and instead create the image and impression that the Devices were safe.

319. Defendants made such statements even after they became aware of numerous and serious complications with the Devices. Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications and other bad data.

320. Defendants made these representations with the intent to induce reliance thereon, and to encourage purchase and implantation of the Devices.

321. The misrepresentations made by Defendants, in fact, were false and known by Defendants to be false at the time the misrepresentations were made.

322. Misrepresentations spanned a number of years, but also include the critical time period of 2017–2018 when the company was in the process of being acquired by the Private Equity Group TPG Capital, which in February 2018 successfully completed a merger agreement. As a result, TPG acquired all of the issued and outstanding common stock of Defendant EXACTECH. In connection with the transaction, Defendant EXACTECH's founders, CEO and certain other management shareholders exchanged a portion of their shares in the transaction, for new equity securities in the post-closing ownership of the Company. See Exactech Announces Completion of Merger with TPG Capital, EXACTECH (Feb. 14, 2018), https://www.exac.com/exactech-announces-completion-of-mergerwith-tpg-capital (last visited Jan. 21, 2023).

323. After the merger in 2018, it still took four years for Defendants to reveal the product defects and their health consequences to the medical community and to the patients, including Plaintiff, even though the key officers of Defendant EXACTECH generally continued with their roles in the newly merged company.

324. Defendants failed to exercise ordinary care in making their representations concerning the Devices and, in the manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce of the Devices.

325. By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

326. By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

327. As a direct and proximate result of Defendants' acts and omissions, including Defendants' negligent misrepresentations regarding the Devices, Plaintiff HARRY W. LIPMAN was implanted with the Devices and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

328. As a further direct, proximate, and legal consequence of Defendants' acts and omissions, including Defendants' negligent misrepresentations regarding the Devices, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 63 of 70 PageID #: 70

and suffering.

329.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

SIXTH CAUSE OF ACTION

BREACH OF EXPRESS WARRANTY

(Against Exactech Defendants and TPG Defendants[7])

330.    Plaintiffs hereby repeat and re-allege by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

331.    Prior to Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

332.    Defendants expressly warranted that the Devices were safe and effective orthopedic devices.

333.    Defendants promised that the Devices had excellent long-term clinical outcomes and that "surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system."

334.    At the time Defendants manufactured, marketed, sold and/or distributed the Devices, they knew that the Devices were intended for human use, and that Plaintiff was a foreseeable user of the Devices.

---

[7]Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under any particular state's governing law.

335. The express warranties represented by Defendants were a part of the basis for Plaintiff's use of the Devices, and she and her surgeon relied on these warranties in deciding to use the Devices.

336. At the time of the making of the express warranties, Defendants had knowledge of the purpose for which the Devices was to be used and warrantied the same to be in all respects safe, effective and proper for such purpose.

337. The Devices did not conform to these express representations, as demonstrated by the fact that Plaintiff's implant failed prematurely due to polyethylene wear of the tibial insert which necessitated her to undergo revision surgery.

338. At the time Defendants marketed, sold and/or distributed the Devices, Defendants expressly warranted that the total knee replacement systems, including all of their component parts, were safe and merchantable for their intended use.

339. Plaintiff and his implanting physician reasonably relied upon Defendants' express warranties.

340. Plaintiff used the Devices for their intended purpose, and in a reasonable, foreseeable manner.

341. The Devices manufactured and sold by Defendants, did not conform to Defendants' express representations because the Devices caused serious injury to Plaintiff when used as recommended and directed.

342. As a direct and proximate result of Defendants' acts and omissions, including breach of express warranty, Plaintiff HARRY W. LIPMAN was implanted with the Devices and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

343.    As a further direct, proximate, and legal consequence of Defendants' acts and omissions, including breach of express warranty, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

344.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

SEVENTH CAUSE OF ACTION

BREACH OF IMPLIED WARRANTY

(Against Exactech Defendants and TPG Defendants[8])

345.    Plaintiffs hereby repeat and re-allege by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

346.    Prior to Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Devices for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

347.    Defendants impliedly warranted, through its marketing, advertising, distributors and sales representatives, that the Devices were of merchantable quality, and fit for the ordinary purposes and uses for which it was sold.

348.    In fact, the Devices were not of merchantable quality nor fit for the ordinary purposes and uses for which it was sold and did not meet the expectations of consumers.

---

[8] Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under any particular state's governing law.

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 66 of 70 PageID #: 73

349.    The Devices manufactured and supplied by Defendants were not of merchantable quality and not fit for the ordinary and/or particular purpose intended as physicians and patients would expect the components to be properly packaged and stored as to avoid premature degradation of component materials.

350.    Plaintiff HARRY W. LIPMAN and/or her physician reasonably relied upon the skill and judgment of Defendants as to whether the Devices were of merchantable quality and safe for intended and particular use and purpose.

351.    Contrary to such implied warranties, the Devices were not of merchantable quality nor safe for intended and particular use and purpose, because Defendants failed to package the polyethylene components of the Devices in vacuum bags containing a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery.

352.    As a direct and proximate result of Defendants' acts and omissions, including breach of implied warranties, Plaintiff was implanted with the Devices and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

353.    As a further direct, proximate, and legal consequence of Defendants' acts and omissions, including breach of implied warranties, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 67 of 70 PageID #: 74

354. Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, and severally, as follows:

a. Judgment in favor of Plaintiff and against all Defendants, for damages in such amounts that exceed the jurisdictional limits of all lower courts of coordinate jurisdiction, the full amount as may be proven at trial;

b. Compensation for both economic and non-economic losses, including but not limited to medical expenses, loss of earnings, disfigurement, pain and suffering, mental anguish, loss of consortium and emotional distress, in such amounts as may be proven at trial;

c. Punitive and/or exemplary damages in such amounts as may be proven at trial;

d. Attorneys' fees and costs;

e. Interest; and

f. Any and all further relief, both legal and equitable, that the Court may deem just and proper.

Dated:     New York, New York
           April 15, 2024

Yours, etc.,

THE LAW OFFICES OF JEFFREY B. MELCER, PLLC
Attorneys for Plaintiff
65 Broadway, Suite 1101
New York, New York 10006
(212) 980-8470
By: Jeffrey B. Melcer, Esq.

Case 1:24-cv-03782-NGG-MMH Document 1-1 Filed 05/14/24 Page 68 of 70 PageID #: 75

## ATTORNEY'S VERIFICATION

The undersigned, an attorney admitted to practice in the Courts of the State of New York, hereby affirms the following to be true under the penalties of perjury:

I, JEFFREY B. MELCER, attorney for the plaintiff in the within action have read the foregoing **VERIFIED COMPLAINT** and know the contents thereof; that the same is true to my own knowledge, except as to those matters therein stated to be alleged upon information and belief, and that as to those matters, your affirmant believes it to be true. The grounds of your affirmant's knowledge are investigations received by your affirmant.

The reason that this verification is made by your affirmant and not by the plaintiff is that the plaintiff does not reside within the County wherein your affirmant's offices are located.

Dated:    New York, New York
         April 15, 2024

_____
JEFFREY B. MELCER

Case 1:24-cv-03782-NGG-MMH   Document 1-1   Filed 05/14/24   Page 69 of 70 PageID #: 76

## AFFIRMATION OF SERVICE

| State of New York | County of New York | Supreme Court |
|---|---|---|

Index Number: 153451/2024
Date Filed: 4/15/2024

Plaintiff:
**Harry W. Lipman**

vs.

Defendant:
**Exactech, Inc., et al.**

**State of New York, County of Albany)ss.:**

Received by Meridian Investigations & Security to be served on **Exactech, Inc.**.

I, Patricia Burke, do hereby affirm that on the **22nd day of April, 2024 at 3:15 pm, I:**

served **Exactech, Inc.** by delivering two true copies of the **Notice of Electronic Filing (Consensual Case), Summons and Verified Complaint pursuant to New York State Section 306 BCL together with statutory service fee in the amount of $40.00** to Sue Zouky as **Business Document Specialist 2** of New York State Department of State, 99 Washington Avenue, 6th Floor, Albany, NY 12210. The New York State Department of state being the Registered Agent/Statutory Agent of record of the within named company, in compliance with state statutes.

Said documents were conformed with index number and date of filing endorsed thereon.

**Description** of Person Served: Age: 70, Sex: F, Race/Skin Color: White, Height: 5'4", Weight: 150, Hair: Brown, Glasses: N

I certify that I am over the age of 18, have no interest in the above action.

I affirm on ___5/4/24___, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

**Patricia Burke**
Process Server

**Meridian Investigations & Security**
**48 Davis Avenue**
**Port Washington, NY 11050**

Our Job Serial Number: SRN-2024002314

Copyright © 1992-2024 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a

Case 1:24-cv-03782-NGG-MMH    Document 1-1    Filed 05/14/24    Page 70 of 70 PageID #: 77

# AFFIRMATION OF SERVICE

**State of New York**             **County of New York**             **Supreme Court**

Index Number: 153451/2024
Date Filed: 4/15/2024

Plaintiff:
**Harry W. Lipman**

vs.

Defendant:
**Exactech, Inc., et al.**

**State of New York, County of Albany)ss.:**

Received by Meridian Investigations & Security to be served on **Exactech U.S., Inc.**.

I, Patricia Burke, do hereby affirm that on the **22nd day of April, 2024** at **3:15 pm**, I:

served **Exactech U.S., Inc.** by delivering two true copies of the **Notice of Electronic Filing (Consensual Case), Summons and Verified Complaint pursuant to New York State Section 306 BCL together with statutory service fee in the amount of $40.00** to **Sue Zouky** as **Business Document Specialist 2** of New York State Department of State, 99 Washington Avenue, 6th Floor, Albany, NY 12210. The New York State Department of state being the Registered Agent/Statutory Agent of record of the within named company, in compliance with state statutes.

Said documents were conformed with index number and date of filing endorsed thereon.

**Description** of Person Served: Age: 70, Sex: F, Race/Skin Color: White, Height: 5'4", Weight: 150, Hair: Brown, Glasses: N

I certify that I am over the age of 18, have no interest in the above action.

I affirm on ____5/4/24____, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
**Patricia Burke**
Process Server

**Meridian Investigations & Security**
**48 Davis Avenue**
**Port Washington, NY 11050**

Our Job Serial Number: SRN-2024002315

Copyright © 1992-2024 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a